***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner, with modifications, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as: *Page 2 
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of these proceedings.
2. The parties are correctly designated, and there is no question as to the mis-joinder or the non-joinder of any party.
3. The appointment of any party who appears in a representative capacity is valid, said party is duly qualified, has authority to appear in the capacity to which said party is designated, and no further proof of appointment or capacity shall be required.
4. In addition to the other stipulations contained herein, the parties stipulate and agree with respect to the following undisputed facts:
 a. The parties were subject to the North Carolina Workers' Compensation Act at all times relevant to these proceedings;
 b. An employment relationship existed between the parties on the date of Plaintiff's alleged injury;
 c. Defendant-Carrier provided workers' compensation insurance coverage to Defendant-Employer on the date of Plaintiff's alleged injury;
 d. Plaintiff's average weekly wage on the date of his alleged injury was $568.40;
 e. Plaintiff missed the following work since the date of his alleged injury: November 3, 2006 through the present;
 f. Defendants denied the compensability of this claim and paid no compensation to Plaintiff. *Page 3 
5. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One (1) — Pre-trial Agreement;
 b. Stipulated Exhibit Two (2) — North Carolina Industrial Commission forms and filings;
 c. Stipulated Exhibit Three (3) — Plaintiff's medical records;
 d. Stipulated Exhibit Four (4) — Defendant-Employer's security camera video of Plaintiff's November 3, 2006 fall;
 e. Defendants' Exhibit One (1) — Written statement of Mr. Mike Harrison dated November 6, 2006;
 f. Defendants' Exhibit Two (2) — Written statement of Mr. Gregg Drees dated November 6, 2006;
 g. Defendants' Exhibit Three (3) — Mother Murphy's, Inc. Incident Investigation form dated November 3, 2006.
 *********** ISSUE
The issue to be determined is whether Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment with Defendant-Employer on November 3, 2006, and if so, to what workers' compensation benefits is he entitled?
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. Plaintiff is 58 years old, with a date of birth of April 19, 1951. As a child, Plaintiff suffered from polio, which significantly weakened the entire right side of his body, partially paralyzed him, and caused his right leg to be one-half (1/2) inch shorter than his left leg, which in turn caused him to walk with a natural limp. Plaintiff also has a rare bone disease called osteogenesis imperfecta, resulting in him having very brittle and frail bones, as well as arthritis in his ankles. Plaintiff sometimes had difficulty walking and doing his job due to aching and arthritis. He testified that at times his ankles were "mighty painful" but he was still able to do his job.
2. Defendant-Employer employed Plaintiff as a warehouse shipping and receiving clerk. Part of Plaintiff's normal work routine included walking from his office to a sample table in the main warehouse, which he did almost every day. Sometimes while at work, Plaintiff had difficulty walking and doing his job due to the arthritis in his ankles and his aching bones. The ratio between walking and sitting for Plaintiff's position was about 50/50. Defendant-Employer required Plaintiff to wear steel-toed, slip-resistant safety shoes.
3. On November 3, 2006, Plaintiff was carrying a piece of paper to the sample table in the main warehouse when he suddenly felt a sharp pain in his right knee, causing his knees to buckle and he fell to the ground. Plaintiff had right knee aches prior to this incident, but nothing as sharp as the pain he experienced at the time just before his fall. Plaintiff does not know what caused the pain in his knee at the time. He was walking in a straight path and there was nothing in his walking path, including any boxes or other objects that would have caused him to slip and fall. Plaintiff testified, "I had a sharp pain in my knee and next thing I know I was on the floor."
4. Dr. Michael Harvey Handy, an orthopaedist who specializes in traumatic injuries, diagnosed Plaintiff with a left tibial plafond fracture, a left fibula fracture with a dislocation of *Page 5 
the ankle, and a right lateral malleolus fracture dislocation. Based upon the extent of Plaintiff's injuries, Dr. Handy recommended an immediate surgical reduction of both ankles, which Plaintiff underwent on the evening of November 3, 2006.
5. Dr. Handy performed another set of surgeries on Plaintiff on November 7, 2006, including a revision of the open reduction and internal fixation of the left tibial plafond, an open reduction and internal fixation of the right lateral malleolus, and an open treatment of the right ankle dislocation. After the November 7, 2006 set of surgeries, Dr. Handy recommended that Plaintiff begin non-weight bearing bilateral physical therapy, which included aquatic/pool therapy, followed by a gradual weight-bearing program until Plaintiff could regain strength in his ankles. Plaintiff continued to make progress with his physical therapy, and on April 9, 2007, Dr. Handy found Plaintiff's ankle fractures to be both clinically and radiographically healed.
6. On February 4, 2008, Dr. Handy opined that Plaintiff was at maximum medical improvement with respect to his bilateral ankle fractures, and that Plaintiff's permanent partial disability ratings should be increased to 65 percent to 70 percent for the left ankle, and 50 percent for the right ankle. Dr. Handy was of the opinion that Plaintiff would be best suited to return to work in a sedentary position. However, Dr. Handy did not specifically state what Plaintiff's permanent work restrictions should be. Plaintiff never returned to work following his November 3, 2006 fall.
7. Dr. Handy was aware of Plaintiff's medical history, which was significant for diabetes, polio resulting in right-sided weakness, hypertension, and osteogenesis imperfecta. Dr. Handy described osteogenesis imperfecta as a disease affecting the fragility and structure of bones that has a wide range of severity. Further, Dr. Handy explained that osteogenesis *Page 6 
imperfecta is a genetic mutation usually diagnosed in childhood, and often causes fractures in small children without any significant trauma.
8. After a review of the surveillance video from a camera located inside Defendant-Employer's warehouse which showed Plaintiff's November 3, 2006 fall, Dr. Handy opined, and the Full Commission finds as fact, that Plaintiff's osteogenesis imperfecta was a significant contributing factor to his fall and resulting injuries. Dr. Handy did not have an opinion on whether the warehouse floor could have contributed to Plaintiff's fall and resulting injuries, and further opined that it was speculation as to whether Plaintiff had some sort of inciting event such as a stumbling incident that caused him to fall. He did not directly answer the question concerning whether Plaintiff's pre-existing conditions, including his polio, his right-sided weakness and his lower extremity weakness, more likely than not, caused his knees to buckle and him to fall to the floor. After acknowledging that it is sometimes impossible to say whether a person fractures before they land or after they land, Dr. Handy did say, based upon his viewing of the video, that it appeared to him Plaintiff started to fracture before he had hit the ground.
9. Ms. Sherry Biggs, the assistant vice president and human resources manager for Defendant-Employer, explained that with regard to workers' compensation claims the injured employee, the injured employee's supervisor, and/or the Defendant-Employer's safety director complete an incident report form. After the incident report form is completed, an investigation is conducted which includes questioning witnesses, obtaining written statements from witnesses, and reviewing videos from security cameras located within Defendant-Employer's warehouse. According to Ms. Biggs, Defendant-Employer followed this procedure with respect to Plaintiff's November 3, 2006 fall. In addition, Defendant-Employer maintained a health file on Plaintiff, so that Ms. Biggs was aware of Plaintiff's health problems and physical condition. *Page 7 
10. Mr. Charles Trout, Defendant-Employer's regulatory compliance officer/safety director, whose job duties consist of conducting regulatory inspections and overseeing food, product, and workplace safety, testified that he was not present when Plaintiff fell on November 3, 2006. However, as part of his job duties as safety director for Defendant-Employer, Mr. Trout began an investigation of Plaintiff's November 3, 2006 fall. The investigation included having Plaintiff and his supervisor fill out an incident report form, interviewing witnesses, and reviewing the security camera video. According to Mr. Trout, other than Plaintiff's November 3, 2006 fall, no other trips, slips, or falls ever occurred in Defendant-Employer's warehouse. In addition, Mr. Trout explained that Defendant-Employer required all employees, including Plaintiff, to wear steel-toed, slip-resistant safety shoes in its warehouse.
11. Mr. Mike Harrison, Defendant-Employer's maintenance/sanitation supervisor, worked in the same area as Plaintiff, and saw him on a daily basis. Mr. Harrison actually witnessed Plaintiff's fall as he was coming out of the storage shed and into Defendant-Employer's warehouse. Mr. Harrison had good visibility of Plaintiff as he was walking toward Plaintiff and he was looking straight at Plaintiff when he fell. According to Mr. Harrison, Plaintiff "just kind of crumpled and fell."
12. During the time that Mr. Harrison worked alongside Plaintiff, he observed Plaintiff having difficulty walking, and walking with a limp. Mr. Harrison also observed that Plaintiff "was always careful, he didn't want to ever fall because of the brittle bones." Mr. Harrison was also aware of Plaintiff's other health conditions, including the fact that he had polio as a child which resulted in right-sided weakness.
13. Mr. Gregg Drees, a shipping and receiving clerk for Defendant-Employer, also worked closely with Plaintiff. Even though Mr. Drees worked in the same position as Plaintiff, *Page 8 
his job duties were very different, in that Plaintiff primarily dealt with handling the written manifests and did not perform any physically demanding tasks due to his physical limitations. Mr. Drees personally observed physical limitations in Plaintiff with respect to strength on his right side and as a result, discouraged him from getting on and off forklifts. Mr. Drees was at work during Plaintiff's November 3, 2006 fall, and was walking a couple of feet in front of him when he suddenly heard Plaintiff scream. According to Mr. Drees, he and another co-worker swept the floor just prior to Plaintiff's November 3, 2006 fall. However, Mr. Drees still inspected the floor all around Plaintiff while he was still lying on the floor, and found that it was still clean and dry.
14. Mr. Greg Beard, the assistant vice president of warehouse and distribution operations for Defendant-Employer, was Plaintiff's supervisor. Mr. Beard was aware that Plaintiff had physical limitations, including right-sided partial paralysis due to polio and also right-sided weakness which created some concerns with regards to his work capabilities. Mr. Beard was not present when Plaintiff fell on November 3, 2006. However, Mr. Beard did receive a telephone call from Mr. Charles Aaron Jessup, Defendant-Employer's shipping and receiving warehouse supervisor, who advised him what happened. When Mr. Beard returned to work shortly thereafter, Plaintiff told him that his "knees had just buckled and he fell and collapsed right there." Once Plaintiff went to the hospital, Mr. Beard immediately filled out an incident report form. When Mr. Beard visited Plaintiff in the hospital, Plaintiff again told him that his knees buckled and he did not have anything to catch himself on before falling. Mr. Beard also reviewed the security camera video and testified that it appeared as though Plaintiff's knees simply buckled, causing him to collapse to the floor, and that the floor conditions were clean and dry at the time of Plaintiff's fall. *Page 9 
15. Mr. Jessup, the shipping and receiving warehouse supervisor who reported Plaintiff's November 3, 2006 fall to Mr. Beard, and whose job duties consist of handling the shipping papers, manifesting and shipping freight to the distribution center, and overseeing company policies and procedures, including safety and hazard procedures, was present when Plaintiff fell. Just prior to Plaintiff's November 3, 2006 fall, Mr. Jessup swept the floor, and so it was clean, dry, and clear of any and all debris. Mr. Jessup did not actually see Plaintiff fall, but he did observe Plaintiff lying on the floor. When Mr. Jessup asked Plaintiff what happened, Plaintiff told him that his "knees just gave out." Mr. Jessup was aware that Plaintiff had polio as a child, and of his other health conditions, including the osteogenesis imperfecta. Mr. Jessup observed that because one of Plaintiff's legs was shorter than the other, he had difficulty moving around and walking, especially up stairs. Mr. Jessup provided a written statement following Plaintiff's November 3, 2006 fall in which he stated that "I asked what had happened and Mr. Haithcock said that his knee went out on him and that he thinks he broke both of his ankles."
16. Defendants denied the compensability of Plaintiff's ankle injuries via a Form 61 dated November 29, 2006. Defendants based the denial of Plaintiff's claim in part on their review of the security camera video. Defendants also relied upon the results of the internal investigation, including the written statements of Mr. Harrison, Mr. Drees, Mr. Beard, and Mr. Jessup, as a basis for denying Plaintiff's claim.
17. Based upon the greater weight of the evidence, the Full Commission finds as fact that Plaintiff fell solely as a result of his knees buckling or giving away after experiencing a sharp pain in his knee. Based upon the greater weight of the evidence the Full Commission further finds as fact that Plaintiff's fall was due to his pre-existing medical conditions unrelated to his employment with Defendant-Employer. Therefore, Plaintiff's November 3, 2006 fall was *Page 10 
due solely to an idiopathic condition and did not arise out of his employment. The evidence does not support a finding or inference that Plaintiff's fall had its origin in the employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. "To be compensable under the Workmen's Compensation Act an injury must result from an accident arising out of and in the course of the employment." Taylor v. Twin City Club,260 N.C. 435, 437, 132 S.E.2d 865, 867 (1963). Although Plaintiff's November 3, 2006 fall was an accident which occurred in the course and scope of his employment, he failed to prove that he sustained a compensable injury arising out of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6) (2008).
2. In Cole v. Guilford County, the Supreme Court of North Carolina held: "[T]he better considered decisions adhere to the rule that where the accident and resultant injury arise out of both the idiopathic condition of the workman and hazards incident to the employment, the employer is liable. But not so where the idiopathic condition is the sole cause of the injury." Cole v.Guilford County, 259 N.C. 724, 131 S.E.2d 308 (1963),citing, Vause v. Vause Farm Equipment Co.,233 N.C. 88, 63 S.E.2d 173 (1951). In the instant case, the greater weight of the evidence establishes that Plaintiff's November 3, 2006 fall was due solely to his idiopathic condition. The evidence does not establish that the hazards of Plaintiff's employment with Defendant-Employer contributed to his November 3, 2006 fall. Because Plaintiff's November 3, 2006 fall arose from pre-existing medical conditions unrelated to his employment, the fact that the fall occurred at work and on Defendant-Employer's premises are both insufficient to *Page 11 
establish that the fall had its origins in Plaintiff's employment.Cole, 259 N.C. 724, 131 S.E.2d 308 (1963).
3. The facts in this case differ from those in Slizewski v.International Seafood, Inc.,46 N.C. App. 228, 264 S.E.2d 810 (1980) and Hodges v. EquityGroup, 164 N.C. App. 339, 596 S.E.2d 31, (2004). InSlizewski, the employee was not experiencing any medical problems relating to his pre-existing leg condition prior to his injury due to a fall at work. The Court noted in Slizewski
that there was no finding of fact "that any force or condition independent of the employment caused or contributed to the accident." Slizewski v. International Seafood, Inc.,46 N.C. App. 228, 233; 264 S.E.2d 810, 813 (1980). InHodges, Plaintiff fell when he was walking to a machine in order to install a guard. He did not trip or slip; he testified that his feet just came out from under him. Defendants contended that Plaintiff's fall was solely caused by an idiopathic condition-either the onset of his disc herniation or problems with his diabetes and high blood pressure. The Plaintiff inHodges had had back surgery three years earlier in the same area as the rupture from the current fall, but the evidence established that he had a 100% recovery from his prior surgery. The Court found that the medical evidence in Hodges established it was unlikely that Plaintiff had a new disc rupture that caused him to fall and that Plaintiff's blood pressure and diabetes were under control prior to his fall. Hodges v. Equity Group,164 N.C. App. 339, 344; 596 S.E.2d 31, 35 (2004). Therefore, the Court found in both cases that the Plaintiff's fall arose out of the employment. In the instant case, the Full Commission has found as fact based upon Plaintiff's testimony and his pre-hearing statements, the testimony of co-workers, the opinions of Dr. Handy and other evidence presented herein that Plaintiff's fall was due to pre-existing medical conditions. The evidence does not support a finding or inference that Plaintiff's fall had its origin in the employment. *Page 12 
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is DENIED.
2. Each side shall bear its own costs.
This the ___ day of November 2009.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER